## UNITED STATES DISTRICT COURT
## MIDDLE DISTRICT OF PENNSYLVANIA

LESA SMALL,                        :

          Plaintiff        :  CIVIL ACTION NO. 3:13-2347

       vs.                      :        (JUDGE MANNION)

CAROLYN W. COLVIN, ACTING  :
COMMISSIONER OF SOCIAL
SECURITY,                         :

         Defendant       :

## <u>MEMORANDUM</u>

## <u>BACKGROUND</u>

    The record in this action has been reviewed pursuant to 42 U.S.C. §405(g) to determine whether there is substantial evidence to support the Commissioner's decision denying Plaintiff Lesa Small's claim for Disability Insurance Benefits ("DIB") under the Social Security Act ("Act"). 42 U.S.C. §§401-433.

    Small protectively filed her application for DIB on November 12, 2010. Tr. 31 and 251.[1] The application was initially denied by the Bureau of Disability Determination on March 7, 2011. Tr. 67-72. On April 13, 2011,

_____

    [1]References to "Tr.___" are to pages of the administrative record filed by the Defendant as part of the Answer on November 15, 2013.

Small requested a hearing before an administrative law judge ("ALJ"). Tr. 74-75. A hearing was held before an ALJ on July 18, 2012. Tr. 27-51. Small was represented by counsel at the hearings. Id. On August 2, 2012, the ALJ issued a decision denying Small's application. Tr. 13-22.

The ALJ , after considering the medical records and the testimony of Small and a vocational expert, found that Small had the functional ability to engage in a limited range of unskilled, light work, and consequently, she was not disabled under the Act. Tr. 17 and 22.

On August 27, 2012, Small filed a request for review with the Appeals Council. Tr. 6-9. The Appeals Council on August 13, 2013, concluded that there was no basis upon which to grant Small's request for review. Tr. 1-5. Thus, the ALJ's decision stood as the final decision of the Commissioner.

Small then filed a complaint in this court on September 10, 2013. Supporting and opposing briefs were submitted and the appeal became ripe for disposition on February 4, 2014, when Small filed a reply brief.

Small was born on June 28, 1965, and at all times relevant to this matter was considered a "younger individual" whose age would not seriously impact her ability to adjust to other work. 20 C.F.R. §404.1516(c).

2

Small, who attended regular education classes during her elementary and secondary schooling, graduated from high school in 1983, and can read, write, speak and understand the English language and perform basic mathematical functions such as paying bills, counting change, handling a savings account and using a checkbook and money orders. Tr. 31, 181, 183 and 192. After graduating from high school Small attended a vocational school and became a licensed practical nurse in 1988. Tr. 183 and 251.

Small's work history covers 22 years and at least 2 different employers. Tr. 176-177 and 277. The records of the Social Security Administration reveal that Small had earnings in the years 1982 through 1992 and 1999 through 2009. Tr. 174. Id.

The vocational expert who testified at the administrative hearing identified Small's past relevant work as follows: (1) a certified nursing assistant described as semiskilled, medium work and (2) a licensed practical nurse described as skilled, medium work. Tr. 46.

In the application for DIB Small claims that she became disabled on July 21, 2009. Tr. 170. Small at that time was working as a licensed practical nurse for The Shook Home, an assisted care facility, located in Chambersburg, Pennsylvania. Tr. 151, 182-183 and 228. Small contends that

while working at that facility she injured her back when she bent over to retrieve some medications out of the bottom drawer of a medicine cart. Tr. 34. When asked by the ALJ "what was the nature of the injury" she testified as follows:

> I am not really sure. I was passing my medications and they had these big carts, you know, it had all our medications in. And I had bent down to the bottom drawer to get some medications out and I got stuck. I couldn't get back up. . . . So I had to kind of walk up, you know, with my hands and then, of course, I called the doctor and went to see the doctor, you know.

Id. Small has not worked since that alleged injury. Tr. 34 and 182.

Small claims that she is disabled as the result of both physical and mental impairments, including degenerative disc disease of the lumbar spine and depression. Tr. 31. She contends that she has constant low back pain which occasionally radiates down to her knees and that she feels "overwhelmingly sad" from not being able to be as active as she used to be. Tr. 36-37.

After terminating her employment, Small applied for workers' compensation benefits. Tr. 18, 34 and 151-168. The workers' compensation claim was settled on September 22, 2010, for $20,000.00 Tr. 155. The Compromise and Release Agreement noted that the settlement was "of a

doubtful and disputed claim" and "not to be construed as an admission by Defendants that Claimant in fact suffered a work related injury." Id.

Although Small claims that she has been disabled and unable to work full-time since July 21, 2009, the record reveals that Small applied for and received unemployment compensation benefits during the first quarter of 2010 in the amount of \$5616.00 and during the 2nd quarter in the amount of \$468.00.[2] Tr. 172.

For the reasons set forth below, we will affirm the decision of the Commissioner of Social Security.

## STANDARD OF REVIEW

When considering a social security appeal, we have plenary review of all legal issues decided by the Commissioner. See Poulos v. Commissioner of Social Security, 474 F.3d 88, 91 (3d Cir. 2007); Schaudeck v. Commissioner of Social Sec. Admin., 181 F.3d 429, 431 (3d Cir. 1999); Krysztoforski v. Chater, 55 F.3d 857, 858 (3d Cir. 1995). However, our review

---

[2] An individual can only collect unemployment compensation if the individual is able and willing to accept work. 43 P.S. §801(d)(1). Although receipt of workers' compensation benefits does not preclude an award of DIB, an ALJ may consider receipt of such benefits when judging a claimant's credibility.

of the Commissioner's findings of fact pursuant to 42 U.S.C. §405(g) is to determine whether those findings are supported by "substantial evidence." Id.; Brown v. Bowen, 845 F.2d 1211, 1213 (3d Cir. 1988); Mason v. Shalala, 994 F.2d 1058, 1064 (3d Cir. 1993). Factual findings which are supported by substantial evidence must be upheld. 42 U.S.C. §405(g); Fargnoli v. Massanari, 247 F.3d 34, 38 (3d Cir. 2001)("Where the ALJ's findings of fact are supported by substantial evidence, we are bound by those findings, even if we would have decided the factual inquiry differently."); Cotter v. Harris, 642 F.2d 700, 704 (3d Cir. 1981)("Findings of fact by the Secretary must be accepted as conclusive by a reviewing court if supported by substantial evidence."); Keefe v. Shalala, 71 F.3d 1060, 1062 (2d Cir. 1995); Mastro v. Apfel, 270 F.3d 171, 176 (4th Cir. 2001); Martin v. Sullivan, 894 F.2d 1520, 1529 & 1529 n.11 (11th Cir. 1990).

Substantial evidence "does not mean a large or considerable amount of evidence, but 'rather such relevant evidence as a reasonable mind might accept as adequate to support a conclusion.'" Pierce v. Underwood, 487 U.S. 552, 565 (1988)(quoting Consolidated Edison Co. v. N.L.R.B., 305 U.S. 197, 229 (1938)); Johnson v. Commissioner of Social Security, 529 F.3d 198, 200 (3d Cir. 2008); Hartranft v. Apfel, 181 F.3d 358, 360 (3d Cir. 1999).

Substantial evidence has been described as more than a mere scintilla of evidence but less than a preponderance. Brown, 845 F.2d at 1213. In an adequately developed factual record substantial evidence may be "something less than the weight of the evidence, and the possibility of drawing two inconsistent conclusions from the evidence does not prevent an administrative agency's finding from being supported by substantial evidence." Consolo v. Federal Maritime Commission, 383 U.S. 607, 620 (1966).

Substantial evidence exists only "in relationship to all the other evidence in the record," Cotter, 642 F.2d at 706, and "must take into account whatever in the record fairly detracts from its weight." Universal Camera Corp. v. N.L.R.B., 340 U.S. 474, 488 (1971). A single piece of evidence is not substantial evidence if the Commissioner ignores countervailing evidence or fails to resolve a conflict created by the evidence. Mason, 994 F.2d at 1064. The Commissioner must indicate which evidence was accepted, which evidence was rejected, and the reasons for rejecting certain evidence. Johnson, 529 F.3d at 203; Cotter, 642 F.2d at 706-707. Therefore, a court reviewing the decision of the Commissioner must scrutinize the record as a whole. Smith v. Califano, 637 F.2d 968, 970 (3d Cir. 1981); Dobrowolsky v.

Califano, 606 F.2d 403, 407 (3d Cir. 1979).


**SEQUENTIAL EVALUATION PROCESS**

To receive disability benefits, the plaintiff must demonstrate an "inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months." 42 U.S.C. §432(d)(1)(A). Furthermore,

> [a]n individual shall be determined to be under a disability only if his physical or mental impairment or impairments are of such severity that he is not only unable to do his previous work but cannot, considering his age, education, and work experience, engage in any other kind of substantial gainful work which exists in the national economy, regardless of whether such work exists in the immediate area in which he lives, or whether a specific job vacancy exists for him, or whether he would be hired if he applied for work. For purposes of the preceding sentence (with respect to any individual), "work which exists in the national economy" means work which exists in significant numbers either in the region where such individual lives or in several regions of the country.

42 U.S.C. §423(d)(2)(A).

The Commissioner utilizes a five-step process in evaluating disability insurance and supplemental security income claims. See 20 C.F.R. §404.1520; Poulos, 474 F.3d at 91-92. This process requires the

Commissioner to consider, in sequence, whether a claimant (1) is engaging in substantial gainful activity, (2) has an impairment that is severe or a combination of impairments that is severe, (3) has an impairment or combination of impairments that meets or equals the requirements of a listed impairment, (4) has the residual functional capacity to return to his or her past work and (5) if not, whether he or she can perform other work in the national economy. Id. As part of step four the administrative law judge must determine the claimant's residual functional capacity. Id.

Residual functional capacity is the individual's maximum remaining ability to do sustained work activities in an ordinary work setting on a regular and continuing basis. See Social Security Ruling 96-8p, 61 Fed. Reg. 34475 (July 2, 1996). A regular and continuing basis contemplates full-time employment and is defined as eight hours a day, five days per week or other similar schedule. The residual functional capacity assessment must include a discussion of the individual's abilities. Id; 20 C.F.R. §404.1545; Hartranft, 181 F.3d at 359 n.1 ("'Residual functional capacity' is defined as that which an individual is still able to do despite the limitations caused by his or her impairment(s).").

## MEDICAL RECORDS

Before addressing the administrative law judge's decision and the arguments of counsel, the court will review Small's relevant medical records which start with the alleged disability onset date of July 21, 2009.

On July 21, 2009, Small visited the emergency department of the Chambersburg Hospital complaining of right back pain. Tr. 282. However, the record of this visit does not delineate the impetus for Small's back pain. Id. The record does not report that Small stated that she injured her back while attempting to retrieve medicine from the bottom drawer of a medicine cart. Id. Instead, Small merely stated that she "had some back pain that began [that] morning." Id. The onset of the pain was described as "insidious and seemed to increase in intensity" and was "nonradiating." Id. She also reported urinary frequency. Id. The record of this visit suggests that in addition to musculoskeletal pain the medical personnel were focusing on the possibility that Small was suffering from a kidney stone or infection. Id. The differential diagnosis was "kidney stones, pyelonephritis[3], musculoskeletal pain and less likely appendicitis." Id. The results of a physical examination were essentially

_____

[3]Pyelonephritis is defined as "inflamation of the kidney and renal pelvis because of bacterial infection[.]" Dorland's Illustrated Medical Dictionary, 1559 (32nd Ed. 2012)

normal other than "some lower right flank tenderness." Id. Several diagnostic tests were performed with negative results other than a urinalysis which revealed yellow hazy urine and a complete blood count which revealed that she suffered from "some anemia." Tr. 283. A CT scan of the abdomen did not reveal the presence of kidney stones. Id. The final diagnosis was right flank pain and Small was discharged from the hospital with a prescription for the narcotic medication Percocet and instructions to follow-up with her family physician. Id.

On July 23, 2009, Small had a follow-up appointment regarding her right low back pain with Philip L. Myers, a physician assistant, employed at Norland Family Medicine located in Chambersburg. Tr. 325. At that appointment Small complained of "[right] lumbar pain, especially with prolonged sitting" which "radiate[d] into the [right] buttocks." Id. Small reported that she had "[m]inimal relief with the use of Percocet and Flexeril." Id. Notably during this appointment Small did not mention that the cause of her pain was an injury at work on July 21st but instead denied any history of trauma. Id. During a physical examination (1) it was observed that Small while standing was in obvious discomfort, (2) her gait was somewhat guarded, (3) she reported an increase in pain with heel and toe walking, (4)

palpation of the right paraspinous muscles revealed "quite a bit of tenderness," (5) the lumbar vertebrae were straight and symmetric, (6) the results of testing of her deep tendon reflexes were normal, (7) she had an equivocal right straight leg raise, and (8) her plantar flexion and extension were intact. Id. The diagnostic assessment was that Small possibly suffered from a herniated or bulging disk. Id. Small was advised regarding the appropriate use of moist heat and protective activity and prescribed the pain medication Vicoprofen. Id. Physician assistant Myers also ordered a series of x-rays of the lumbosacral spine. Id. The x-rays (five views) were performed on July 24, 2009, and revealed "[m]ild scoliotic changes [] with convexity toward the left" and "[s]ome degenerative spurring [] present anteriorly at every level." Tr. 292. The impression of the physician interpreting the x-rays was "[e]arly degenerative spondylitis."[4] Id.

At a follow-up appointment with physician assistant Myers on July 24, 2009, Small reported a 50% improvement in her symptoms "with occasional pain radiating into the [right] sciatic area." Tr. 324. The results of a physical examination were completely normal other than an equivocal right straight leg

---

[4]Spondylitis is defined as "inflamation of the vertebrae[.]" Dorland's Illustrated Medical Dictionary, 1754 (32nd Ed. 2012). When more than one vertebral joint is involved it is referred to as spondylarthritis. Id. at 1753

raise test. Id. Physician assistant Myers noted that the x-rays revealed "changes consistent with osteoarthritis" and his diagnostic assessment was "low back pain improving." Id. Small was advised to continue applying moist hear and taking Vicoprofen. Id. She was "[g]iven back exercises to do at home" and "a work note until the middle of the week." Id.

The next medical records that we encounter relate to examinations and treatment of Small's low back pain by Bradley A. Jahn, D.C., a chiropractor. Tr. 480-486. Small had an initial consultations with Dr. Jahn on July 31, 2009, at which Small complained of pain, spasms, soreness, burning, tingling, swelling of the lower back with radiation of the symptoms to the right thigh, calf and foot. Tr. 485. Small described her symptoms as severe and constant and rated her pain as a 9 on a scale of 1 to 10. Id. Small reported that her condition was the result of a work-related injury, i.e., "she noticed low back pain while bending over her medication cart passing out meds." Id. Dr. Jahn's examination revealed, inter alia, that Small had an abnormal gait, reduced range of motion, tenderness, and spasm in the lumbar spine and reduced muscle strength in the right lower extremity. Id.

Dr. Jahn administered chiropractic treatments at this initial consultation and on August 3, 5, 7, 10 and 12, 2009. Tr. 480-484.

At the last treatment session on August 12th Dr. Jahn stated that Small's "symptoms appear to be worsening, so we will need to revise the current treatment plan" and her "condition appears to be guarded." Tr. 480. Dr. Jahn ordered an MRI and referred Small to a neurologist "to identify the need for surgical intervention." The MRI was performed on August 13, 2009, and revealed multilevel degenerative disc disease, a mild leftward scoliosis, and facet arthrosis at the L3-L4, L4-L5 and L5-S1 levels. Tr. 293. The degenerative disc disease involved '[g]eneralized spondylosis and disc bulges [] from L1-L2 through L4-L5" and "mild non compressive bilateral neural foraminal narrowing." Id. The record reveals that Small received no further treatment from Dr. Jahn until 2012 and that treatment will be reviewed subsequently in chronological order.

On August 20, 2009, James Robinson, M.D., of Norland Family Medicine, noted that Small reported persistent low back pain despite having no acute abnormal physical examination findings and no evidence of significant disc herniation or nerve impingement. Tr. 322. Dr. Robinson advised Small to remain off work, referred her to physical therapy, and prescribed medications, including a steroid. Id. Small had physical therapy appointments at the Chambersburg Hospital on August 21, 25 and 28. Tr.

255-258. At a follow-up appointment with Dr. Robinson on August 28, 2009, Small reported some mild improvement with physical therapy and steroid medication. Tr. 321. Dr. Robinson referred Small to the Spine Center located in Hagerstown, Maryland, for pain management. Tr. 322.

The first appointment at the Spine Center occurred on September 1, 2009, with Steven Sloan, M.D. Tr. 260-262. A physical examination by Dr. Sloan revealed that Small's lumbosacral spine had normal alignment; she had normal range of motion which did not provoke pain; she had some tenderness to palpation over the midline of the spine; she had equivocal facet loading bilaterally at L5-S1; she had a degree of spasm but no trigger points in the paraspinous muscles; her sacroiliac joints were non-tender to palpation; she had negative straight leg raising and Patrick's tests;[5] she had normal (5/5) muscle strength in the lower extremities; her sensation was grossly intact; and she could stand on her heels and toes without difficulty. Tr. 261. After performing the physical examination and reviewing the MRI of August 13, 2009, Dr. Sloan's diagnostic assessment was that Small suffered from lumbar degenerative disc disease at the L3-L4 and L4-L5 levels, lumbar

---

[5]The Faber test or Patrick's test is a pain provocation test which reveals problems at the hip and sacroiliac regions. Faber is an acronym which stands for flexion, abduction and external rotation.

facet arthropathy and myofascial (muscular) low back pain. Id. Dr. Sloan prescribed pain medications and recommended epidural steroid injections. Tr. 262. Epidural steroid injections were administered on September 1 and 17, 2009; and a lumbar medial branch nerve block under fluoroscopic guidance on September 28, 2009. Tr. 263-265. Small underwent radiofrequency ablation of the lumbar medial branch nerve on October 19, 2009. Tr. 266. None of these procedures according to Small improved her symptoms other than on a very temporary basis. Tr. 262-268.

Small had appointments with Ali El-Mohandes, M.D., at the Spine Center on November 25 and December 23, 2009, and January 20, 2010. Tr. 267-269. Small continued to report persistent low back and buttock pain. Id. With respect to physical examination findings, the items reported were subjective extremity pain, gait abnormality, positive facet testing, and muscle spasms. Id. The diagnostic assessment remained the same. Id. Small was prescribed pain medications. Id.

On January 22, 2010, Small underwent an MRI of lumbar spine which "did not reveal changes or pathology" from the prior MRI showing degenerative disc disease and degenerative facet changes, but no evidence of disc herniation. Tr. 270 and 489.

On February 5, 2010, Small had appointments with Dr. El-Mohandes at the Spine Center. Tr. 270. Small continued to report persistent low back and buttock pain. Id. With respect to physical examination findings, the items reported were subjective extremity pain, gait abnormality, positive facet testing, muscle spasms, inability to walk on right toes, a diminished Achilles reflex on the right as compared to the left, and give away weakness in the right flexor hallucis.[6] Id. The diagnostic assessment remained the same but with the addition of right lower extremity weakness. Id. Small was prescribed pain medications. Id.

On March 22, 2010, Small had an appointment with Dr. Robinson at Norland Family Medicine. Tr. 318-320. Small continued to complain of low back pain. Id. Dr. Robinson's report of this appointment does not set forth any objective physical examination findings but merely a history of Small's present illness which states in toto as follows:

> Patient comes in today for [follow-up] of low back pain. This had initially started in July of last year. She had been seen in the ER at [Chambersburg] on 7/21//09. Apparently reported at that time that [symptoms] began when she was bending down to get something off a cart at work. There was no past history of back problems reported prior to that. She was then seen in [follow-up] at

_____

[6]The flexor hallucis longus helps (1) bend the big toe, (2) point the foot to a downward position (plantar flexion), (3) turn the foot to one side so the sole is facing inward, and (4) support the arch of the foot.

our office by Mr. Myers on the 23rd and 24th of July. She had plain x-rays ordered of the lumbosacral spine which showed some early degenerative changes. She was treated conservatively with anti-inflammatory agents and rest. She felt that [symptoms] were not improving and went for chiropractic evaluation with Dr. Bradley Jahn in [Chambersburg]. Apparently reported to him also that her [symptoms] started after she had bent over at work. At this point, I do not have a copy of his initial evaluation or treatment notes. He did order an MRI of the lumbosacral spine which showed multi level degenerative disk disease and some degenerative facet changes, but no evidence of disk herniation or nerve compression. Because of persistent [symptoms], [she] was then referred for physical therapy and also was referred to the spine center in Hagerstown for Pain management. Apparently has gone through evaluation there and epidural injections, though I only have one office note date 11/25/09 from Dr. El-Mohandes. She did not get any relief with the epidural steroid injections. She was ultimately placed on Savella for myofascial pain component and place[d] on Ryzolt 100 mg to use daily as a long-acting pain reliever and [as needed ] use Percocet. At this point she is apparently in the middle of a dispute with her employer in terms of whether or not this is truly a work related injury. As stated above, I did not see her on her initial evaluation in July. There is no clear documentation of a work related event though both the patient and companion who is with her today recall reporting this incident on her initial evaluation. At this point, I will get copies of records form the chiropractor that she had seen and also from the center for spine medicine and review the history taken by them. It is certainly possible that the patient did report that [symptoms] began after some event that occurred at work, though this is not clearly documented in her record at this point.

Tr. 319. Dr. Robinson's diagnostic assessment on this date was chronic low

back pain and he prescribed, inter alia, narcotic pain medications. Id.

As of April 28, 2010, Dr. El-Mohandes released Small to return to work,

noting that although she continued to have pain, it was controlled with

Percocet. Tr. 271. Dr. El-Monhandes considered that Small might require a functional capacity or disability evaluation and addressed her complaints of depression and difficulty coping by referring her for a psychological evaluation. Id. Small continued to visit the Spine Center through July 9, 2010. Tr. 272-275. She had appointments on May 6, June 10 and July 9 with Dr. Sloan. Id. The diagnostic assessments on June 10th and July 9th included a finding of depression. Id.

On June 29, 2010, Small had an appointment with physician assistant Myers at Norland Family Medicine regarding her complaints of back pain and depression. Tr. 315. The primary purpose for the visit stated in the record of the appointment was to obtain a referral to Summit Behavioral Health. Id. Mr. Myers did not report any objective physical or mental health examination findings other than vital signs and that Small's affect was appropriate and that she had "a bit of tearfulness when discussing the situation with her back." Id. Mr. Myers's diagnostic assessment was that Small suffered from chronic low back pain and depression. Id. Mr. Myers prescribed the antidepressant Effexor and initiated a psychiatric consult for Small. Id. A follow-up appointment was scheduled in 3 to 4 weeks. Id.

On July 14, 2010, Small had an appointment with Dr. Robinson at

Norland Family Medicine regarding her back pain. Tr. 312-313. In the report of the appointment Dr. Robinson noted that Small was being treated at the pain clinic in Hagerstown for her back pain and that she was recently started on Effexor for "some mild depression." Id. Dr. Robinson did not report any objective physical or mental health examination findings other than she appeared comfortable and her judgment was normal. Id. Dr. Robinson stated that he spent 30 minutes with Small discussing the "use of pain medications and outlining the protocol for chronic opioid use." Id. Dr. Robinson stated that he prescribed the opioid pain medication Oxycontin and recommended that Small taper and then discontinue the use of Savella "especially now that she [was] taking Effexor." Id. He also noted that he would send a letter to the spine center indicating that he would from now on handle Small's prescriptions. Id. Dr. Robinson's diagnostic assessment was that Small suffered from "chronic low back pain requiring low (sic) term pain management." Id. Dr. Robinson also described Small low back condition as "lumbago."[7] Id.

At an appointment with Dr. Robinson on July 28, 2010, Small reported that her pain level had increased since tapering and discontinuing Savella but

---

[7]Lumbago is defined as "a nonmedical term for any pain in the lower back." Dorland's Illustrated Medical Dictionary, 1076 (32nd Ed. 2012).

that she had some improvement in her depressive symptoms since starting Effexor. Tr. 310. Dr. Robinson did not report any objective physical or mental health examination findings other than she appeared uncomfortable, her nutritional status was normal and her judgment was normal. Id. Dr. Robinson's diagnostic assessment remained the same and he increased Small's dosage of Oxycontin and continued her on Effexor. Id.

On August 11, 2010, Small based on a referral from Dr. Robinson had an appointment with Syyeda F. Syed, M.D., a psychiatrist at Coldbrook Behavioral Health Services located in Chambersburg. Tr. 276-278. Small reported depression related to having chronic back pain. Tr. 276. Small denied mania or hypomania, anxiety, panic attacks, agoraphobia, posttraumatic stress disorder, an eating disorder, obsessive compulsive disorder or memory problems. Tr. 276-277. Small stated that she smoked 1 pack of cigarettes per day and she did not consume any alcohol or drugs in the past year. Tr. 277. A mental status examination performed by Dr. Syed revealed that Small was casually dressed with good personal hygiene; she walked with some discomfort; she described her mood as depressed; she had no psychomotor agitation or retardation; her speech was normal in rate, tone and volume; her affect was dull and constricted; her thought process was goal

directed; she had no suicidal or homicidal ideation, intentions or plan; she was devoid of any type of auditory, visual or tactile hallucinations; she had no delusions; her recent and remote memory were intact; her abstract thinking was reasonable; she was able to register and recall 3 words; she was able to spell the word "candy" backwards and forwards; her fund of knowledge and insight were fair; and her judgment was intact. Tr. 277-278. Dr. Syed's diagnostic assessment was that Small suffered from depressive disorder, not otherwise specified, and a mood disorder as the result of chronic back pain. Tr. 278. He gave Small a Global Assessment of Functioning (GAF) score of 45.[8] Dr. Syed increased Small's dosage of Effexor, prescribed the antidepressant medication trazodone to treat her insomnia and referred her to counseling. Id.

Small had appointments with Dr. Robinson at Norland Family Medicine on August 18, September 22, October 20 and November 24, 2010, and February 7, March 15 and April 18, 2011. Tr. 297-308, 360-362 and 419-422.

_____

[8]The GAF score allows a clinician to indicate his judgment of a person's overall psychological, social and occupational functioning, in order to assess the person's mental health illness. *Diagnostic and Statistical Manual of Mental Disorders* 3–32 (4th ed. 1994). A GAF score of 41-50 indicates serious symptoms or any serious impairment in social, occupational or school functioning. Id. A GAF score of 51 to 60 represents moderate symptoms or any moderate difficulty in social, occupational, or school functioning. Id.

The reports of those appointments reveal that Small continued to complain of low back pain and that Dr. Robinson's diagnostic assessment essentially remained the same. Id. Furthermore, objective physical examination findings relating to her low back pain were absent other than several times reporting decreased range of motion without specifying the degree or extent of the limitation. Id. Notably, Dr. Robinson reported that Small appeared comfortable other than on February 7, March 15 and April 18, 2011, when he reported she appeared uncomfortable; she had normal judgment; she had a grossly normal mental status; she had a normal affect; and she was oriented to person, place and time. Id.

On January 18 and 19, 2011, Small based on a referral from Dr. Robinson underwent a functional capacity evaluation by WorkWell Systems, Inc., at the Chambersburg Hospital. Tr. 207-219. The evaluation was performed by Angie High, a licensed occupational and rehabilitation therapist. Id. After performing testing for two days, Ms. High reported that Small "was pleasant and voiced willingness to fully participate in testing, lifting items were self limited prior to objective signs of maximal effort;" Small showed consistent weakness in her upper and lower extremities; Small reported discomfort present in the low back during all activities and objective signs coincided with

Small's reports of discomfort; and Small had the functional ability to engage in sedentary work as defined by the U.S. Department of Labor. Tr. 208.

On February 11, 2011, Small was examined on behalf of the Bureau of Disability Determination by Amatul B. Khalid, M.D., of Chambersburg Medical Associates. Tr. 347-356. A physical examination of Small performed by Dr. Khalid revealed that Small had an ataxic gait with limping on the right leg but she was not using an assistive device; she had normal range of motion, muscle strength, tone, stability and appearance of the cervical spine (neck); she had normal range of motion, stability, muscle strength, tone and appearance of the spine, ribs and pelvis (other than some tenderness and a positive straight leg raise test on the right at 70 degrees and on the left at 80 degrees); her upper extremities had normal range of motion, stability, muscle strength, tone and appearance; her lower extremities had normal range of motion, stability, muscle strength, tone and appearance as well as no edema and calf tenderness; and neurologically she was grossly intact and had normal sensation to light touch and vibration. Tr. 350-351. From a psychiatric standpoint Dr. Khalid reported that Small had normal judgment; she was oriented to person, place and time; and her mental status was grossly normal. Id. However, she did state that Small had a depressed affect. Id. Dr. Khalid's

diagnostic assessment was that Small suffered from degenerative disc disease, facet arthropathy, lumbar spondylosis and myofascial pain. Tr. 351. Dr. Khalid noted that the MRI of August, 2009, revealed multi-level disc disease and degenerative facets but the there was no indication of disc herniation or nerve compression. Id. She also reported that Small appeared uncomfortable while sitting with frequent changes in posture and Small had difficulty ambulating from the chair to the examining table as well as lying down on the table. Id. On a "Medical Source Statement of Claimant's Ability to Perform Work-Related Physical Activity" form, Dr. Khalid indicated that Small could occasionally lift and carry up to two to three pounds; stand and walk less than 1 hour in an 8-hour workday; sit ten to fifteen minutes in and 8-hour workday; had a limited ability to push and pull with the upper and lower extremities; could never bend, kneel, stoop, crouch, or climb; and could only occasionally balance. Tr. 353-354.

On February 23, 2011, Nghia Van Tran, M.D., reviewed Small's medical records on behalf of the Bureau of Disability Determination and concluded that Small could perform light exertional work which occasionally required climbing, balancing, stooping, kneeling, crouching and crawling.

On February 24, 2011, Manella Link, Ph.D., a psychologist, reviewed

Small's medical records on behalf of the Bureau of Disability and concluded Small suffered from affective disorders but that those disorders did not meet the requirements of any listed impairment. Tr. 56. Dr. Link opined that Small was moderately limited in her ability to maintain attention and concentration for extended periods; perform activities within a schedule; maintain regular attendance; be punctual within customary tolerances; complete a normal workday and workweek without interruptions from psychologically based symptoms; perform at a consistent pace without an unreasonable number and length of rest periods; and respond appropriately to changes in the work setting. Tr. 59-60.

On June 8, 2011, Small had an appointment with Dr. Robinson at which she complained of extreme anxiety. Tr. 415-416. Her blood pressure was 150/90. Tr. 416. It was revealed that she quit taking Effexor a few weeks prior to the appointment because she did not think it was working. Id. Small also reported that her back pain had "been fairly tolerable." Id. The only objective findings reported by Dr. Robinson were that Small appeared alert, clearly anxious and somewhat distraught and her thought processes were clear and her judgment normal. Id. The diagnostic assessment was that Small had suffered an exacerbation of anxiety as the result of being off Effexor. Id. Small

was prescribed Zoloft and Xanax and a follow-up appointment scheduled in 3 to 4 weeks. Id.

At the follow-up appointment on July 13, 2011, Small reported that her anxiety was "somewhat better" but she was still having trouble sleeping and ongoing back problems. Tr. 414. The only objective findings reported by Dr. Robinson were that Small appeared alert but in some discomfort and her blood pressure was much better (112/70). Id. Dr. Robinson assessment was that Small's anxiety had improved since being on Zoloft and Xanax. Id. Dr. Robinson increased Small's dosage of Zoloft and scheduled a one month follow-up appointment.

Also, on July 13, 2011, Dr. Robinson completed on behalf of Small both mental and physical functional capacity assessment forms. Tr. 363-366 and 463-467. The physical functional capacity assessment form was not fully completed by Dr. Robinson. Instead he referred to a "functional capacity evaluation attached" which was not attached to the document and we assume he is referring to the assessment completed by Ms. High. Dr. Robinson did indicate on the form that Small could only occasionally reach and handle and frequently finger and feel; she was unlimited with respect to seeing, hearing and speaking; she constantly experiences pain and fatigue sufficiently severe

to interfere with attention and concentration to perform even simple work tasks; her impairments are expected to last at least 12 months; and she is likely to be absent from work as a result of her impairments more than three times per month. Tr. 465-467.

In the mental functional assessment form, Dr. Robinson checked "poor to none" (defined as no useful ability to function) with respect to Small's ability to maintain attention for two hour segments, maintain regular attendance and be punctual within customary tolerances, complete a normal workday and workweek without interruptions from psychologically based symptoms, respond appropriately to changes in a routine work setting, deal with normal work stress, set realistic goals or make plans independently, deal with stress of semiskilled and skilled work, travel in unfamiliar places and use public transportation. Tr. 363-365. Dr. Robinson did not fully complete the mental functional assessment form. Tr. 364-366. Specifically, he did not complete the portion of the form directing him to enumerate the medical/clinical findings that supported his assessment. Id. Dr. Robinson also did not specify when the mental impairments arose or how long they were expected to last. Id.

On July 31, 2011, Small was hospitalized at the Chambersburg Hospital after suffering a seizure at home. Tr. 389-400. During the seizure Small

suffered a head injury, a laceration of the parietal scalp. Tr. 391. The lacerations was cauterized and closed with 11 sutures. Tr. 395. The record suggest she lost a significant amount of blood. Tr. 396. An electroencephalogram performed on July 31, 2011, revealed no significant abnormality. Tr. 389. An MRI of Small's brain performed on August 1, 2011, was normal. Id. Blood work suggested chronic iron deficiency anemia. Tr. 392 and 396. She was monitored for evidence of neurologic deterioration and treated with the anticonvulsant medications Lamictal and Dilantin. Tr. 389. During the course of her hospitalization, she received blood transfusions and she became more alert, her ambulatory function improved and she was less ataxic.[9] Id. Small was discharged from the hospital on August 2, 2011, in a satisfactory condition with prescriptions for Zoloft, Neurontin, Oxycontin, Tylenol, Percocet, Lamictal, Dilantin and an iron supplement. Id.

On August 8, 2011, Small had a follow-up appointment at Norland Family Medicine with a certified physicians assistant regarding her recent hospitalization and to have the sutures removed. Tr. 411-412. The report of this appointment states that the wound was "well healed." Tr. 412. No

---

[9] Ataxic (or atactic) is defined as "lacking coordination; irregular; pertaining to or characterized by ataxia." Dorland's Illustrated Medical Dictionary, 170-171 (32nd Ed. 2012). Ataxia is defined as "failure of muscular coordination; irregularity of muscular action." Id.

objective examination findings were reported regarding her alleged musculoskeletal or mental health problems other than it was reported that she was "sitting comfortably." Id.

On August 11 and September 12, 2011, Small had appointments with Dr. Robinson at Norland Family Medicine regarding the recent hospitalization and to review laboratory tests. Tr. 405-410. At the appointments Dr. Robinson did not record any objective physical or mental examination findings other than on August 11th Small was alert and oriented and on September 12th she was alert and oriented, appeared moderately uncomfortable and had normal blood pressure. Tr. 406 and 409. Also, at the appointment on September 12th Dr. Robinson noted that recent blood tests, including a complete blood count, were completely normal. Tr. 406.

On October 5, 2011, Small had an appointment with Stanton E. Sollenberger, D.O., a neurologist at Cumberland Valley Neurological Consultants. Tr. 423-424. The report of this appointment contains no objective physical or mental examination findings other than vital signs which were completely normal. Id. Dr. Sollenberger did note that Small was doing well and tolerating her medications. Tr. 424.

On October 20 and November 21, 2011, and January 23, March 23, and

May 22, 2012, Small had appointments with Dr. Robinson regarding her complaints of low back pain. Tr. 443-448. On October 20th Dr. Robinson reported that Small was alert, her discomfort was manageable and she had no acute abnormal physical examination findings; on November 20th Small was alert, appeared to be in some discomfort but had no acute abnormal physical examination findings; on January 23rd Small was alert, had a normal affect, appeared in some discomfort while sitting in a chair, and had mildly elevated blood pressure; on March 23rd Small was alert and had a normal affect; and on May 22nd Small was alert, had a normal affect, and her blood pressure was normal. Id. Dr. Robinson's assessment on each occasion was chronic low back pain and he prescribed narcotic pain medications. Id.

Between May 19, 2011, and June 14, 2012, Small had 14 therapy sessions at Cumberland Valley Counseling Associates. Tr. 426, 438-442 and 458-462. An initial treatment plan prepared on May 19, 2011, noted that her psychiatric diagnosis was major depressive disorder, recurrent, severe without psychotic features and she was given a current GAF score of 53[10]. Tr. 438. Treatment notes reflect that Small went on vacation in Florida, turned a second story room into her private place for crafts and television, had

———————————

[10] See footnote 8, above.

arguments with her husband regarding her use of pain medications, went to garage sales, cared for her son who was in an automobile accident, and was raising her four year old grandson. Tr. 428-431, 458-459 and 462.

From April 17 through May 16, 2012, Small had six appointments with Dr. Jahn at Susquehanna Chiropractic located in Chambersburg. Tr. 468-479. Dr. Jahn repeatedly reported positive musculoskeletal tests, including positive straight leg raising tests, and administered several different types of chiropractic treatments to Small's thoracic, lumbar and sacral spine. Id. Dr. Jahn in the report of each appointment stated in a conclusory fashion that Small was unable to work. Id. He did not specify any work-related functional abilities such as Small's ability to sit, stand, walk, lift, carry or bend.[11] Id.

On May 23, 2012, Small had an appointment with Dr. Syed at Summit Behavioral Health located in Chambersburg regarding her ongoing complaints of depression. Tr. 453-455. Dr. Syed noted that he last saw Small in August,

---

[11]A chiropractor is not an "acceptable medical source" under the Social Security regulations "to establish whether [a claimant] has a medically determinable impairment." 20 C.F.R. §404.1513(a). A chiropractor may be considered an "other source[] to show the severity of [a claimant's] impairment(s) and how it affects [the claimant's] ability to work." 20 C.F.R. §404.1513(d). Dr. Jahn did not provide a functional assessment at any point regarding Small's work-related functional ability, including his ability to sit, stand, walk, and lift or carry items. Furthermore, he did not specify the expected duration of any disability.

2010, for an evaluation and then she was managed by Dr. Robinson with respect to her psychiatric medications. Tr. 453. Small denied mania or hypomania, panic attacks, an eating disorder, obsessive compulsive disorder, psychotic symptoms and cognitive or memory problems. Tr. 453-454. Small stated that she smoked 1 pack of cigarettes per day and she did not consume any alcohol or drugs in the past year but admitted that she took an extra dose of Percocet the previous year which made her pass out and hit her head causing her to suffer a seizure. Tr. 454. A mental status examination performed by Dr. Syed revealed that Small was casually dressed with fair personal hygiene and appeared her stated age; she described her mood as depressed; her affect was dull and constricted; she had no psychomotor agitation or retardation; her speech was normal in rate, tone and volume; her thought processes were clear and coherent; she had no suicidal or homicidal ideation, intentions or plan; she was devoid of any type of auditory, visual or tactile hallucinations; she had no delusions; her recent and remote memory were intact; her abstract thinking was reasonable; her fund of knowledge and insight were fair; and her judgment was intact. Id. Dr. Syed's diagnostic assessment was that Small suffered from depressive disorder, not otherwise specified; a pain disorder associated with psychological factors; and a general

medical condition (GMC) anxiety disorder, not otherwise specified. Id. He gave Small a GAF score of 50. Dr. Syed increased Small's dosage of Zoloft, and prescribed trazodone to treat her insomnia and Buspar to treat her anxiety. Id.

## DISCUSSION

The ALJ went through the five-step sequential evaluation process and found at step five that Small was not disable. The severe impairments found at step two were lumbar degenerative disc disease, a mood disorder and anxiety disorder. Tr. 15 At step three, the ALJ found that Small's physical and mental health impairments did not meet or medically equal the requirements of any listed impairment. Tr. 16-17. With respect to the residual functional capacity the ALJ found that although Small could not perform her past relevant work as a nursing assistant and licensed practical nurse she could perform a limited range of unskilled, light work. Tr. 17 and 21-22. Specifically, Small could engage in light work as defined in the regulations except it had to be

> limited to work that can be done sitting or standing, at her discretion. She is limited to occasional balancing, stooping, kneeling, crouching and crawling. She should avoid temperature extremes and high humidity. She has

> moderate restriction (defined as more than slight
> limitation but the function can still be performed on a
> consistent enough basis to be satisfactory to an
> employer) in the following areas; maintain
> attention/concentration; perform activities within a
> schedule; maintain regular attendance and be punctual
> within customary tolerances; complete a normal
> workday/workweek without unreasonable number and
> length of rest periods due to psychological symptoms;
> respond appropriately to changes in a work setting; and
> appropriately to work pressures in a work setting.

Tr. 17.

In setting the residual functional capacity, the ALJ reviewed the medical evidence, including the notes of Small's treating physicians, found that Small was not credible, rejected the opinions of Dr. Robinson which incorporated the functional assessment of Ms. High, rejected the opinions of Dr. Khalid and Dr. Syed, and relied on the opinions of Dr. Tran and Dr. Link. Tr. 17-21. In addition the ALJ found that Small's statements about her physical and mental functional limitations were not credible. Tr. 18-19. The ALJ further rejected a third-party report from Small's mother (which was very similar to the one submitted by Small) because her statement regarding Small's limitations was "out of proportion with the objective medical findings and conservative level of care" provided to Small. Tr. 20. The ALJ also noted that Small performed a wide range of activities, including cooking, cleaning, shopping, working on

crafts, driving, and watching her grandson, despite pain and psychological symptoms. Tr. 19-20.

At step five based on the above residual functional capacity and the testimony of a vocational expert the ALJ found that Small could perform work as an information clerk, conveyor line bakery worker, and laminating machine tender, and that there were a significant number of such positions in the local, state and national economies. Tr. 22. All of these positions were identified by the vocational expert as unskilled, light work. Tr. 46-47.

Small claims that the ALJ erred by (1) finding that she could engage in a range of light work, and (2) finding that Small only had moderate mental health restrictions.

The Court of Appeals for this circuit has set forth the standard for evaluating the opinion of a treating physician in Morales v. Apfel, 225 F.3d 310 (3d Cir. 2000). The Court of Appeals stated in relevant part as follows:

> A cardinal principle guiding disability eligibility determinations is that the ALJ accord treating physicians' reports great weight, especially "when their opinions reflect expert judgment based on a continuing observation of the patient's condition over a prolonged period of time." . . . The ALJ must consider the medical findings that support a treating physician's opinion that the claimant is disabled. In choosing to reject the treating physician's assessment, an ALJ may not make "speculative inferences from medical reports" and may

> reject "a treating physician's opinion outrightonly on the basis of contradictory medical evidence" and not due to his or her own credibility judgments, speculation or lay opinion.

Id. at 317-18 (internal citations omitted). The administrative law judge is required to evaluate every medical opinion received. 20 C.F.R. §404.1527(d). In the present case, the administrative law judge in his decision specifically addressed the opinion of Dr. Robinson as well as the opinions of Dr. Khalid and Dr. Syed.

The social security regulations specify that the opinion of a treating physician may be accorded controlling weight only when it is well-supported by medically acceptable clinical and laboratory diagnostic techniques and is not inconsistent with other substantial evidence in the case. 20 C.F.R. §404.1527(d)(2); SSR 96-2p. Likewise, an administrative law judge is not obliged to accept the testimony of a claimant if it is not supported by the medical evidence. An impairment, whether physical or mental, must be established by "medical evidence consisting of signs, symptoms, and laboratory findings," and not just by the claimant's subjective statements. 20 C.F.R. §404.1508 (2007).

No treating physician other than Dr. Robinson, a family practitioner, submitted a functional assessment of Small which indicated that she was

functionally impaired from a physical standpoint for the requisite continuous 12 month period.[12] Dr. Robinson did not identify the clinical findings on which he based his opinion. Likewise, no treating physician provided a functional assessment indicating that Small was functionally impaired from a mental health standpoint for the requisite 12 month period.

The ALJ gave several reasons for rejecting the opinion of Dr. Robinson. First, Robinson was not a specialist in psychiatry. Tr. 20. Second, Dr. Robinson provided no objective findings to support the significant mental limitations set forth on the assessment form. Id. The ALJ also pointed out that Dr. Robinson's assessment of Small's physical limitations was not supported by the objective medical evidence. Our review of Dr. Robinson's notes set forth above clearly show that generally objective findings were absent from his treatment notes. As for Dr. Khalid's opinion she was a non-treating physician who examined Small on one occasion. Furthermore, the ALJ did not have to accept her assessment of Small's limitations in light of the benign examination findings and the opposing opinion of Dr. Tran. As for Dr. Syed he only

---

[12]To receive disability benefits, the plaintiff must demonstrate an "inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months." 42 U.S.C. §432(d)(1)(A).

examined Small on two occasions and did not provide a mental functional assessment indicating that Small was unable to engage in the mental requirements of unskilled, light work for the requisite continuous 12 month period. Under the circumstances presented, it was appropriate for the ALJ to conclude based on the opinions of Dr. Tran and Dr. Link that Small only had moderate mental limitations and had the physical and mental functional ability to engage in a limited range of full-time unskilled, light work. The administrative law judge's reliance on the opinions of Dr. Tran and Dr. Link was appropriate. See Chandler v. Commissioner of Soc. Sec., 667 F.3d 356, 362 (3d Cir. 2011) ("Having found that the [state agency physician's] report was properly considered by the ALJ, we readily conclude that the ALJ's decision was supported by substantial evidence[.]").

To the extent that Small argues that the administrative law judge did not properly consider her credibility, the administrative law judge was not required to accept Small's claims regarding her physical and mental limitations. See Van Horn v. Schweiker, 717 F.2d 871, 873 (3d Cir. 1983)(providing that credibility determinations as to a claimant's testimony regarding the claimant's limitations are for the administrative law judge to make). It is well-established that "an [administrative law judge's] findings based on the credibility of the

applicant are to be accorded great weight and deference, particularly since [the administrative law judge] is charged with the duty of observing a witness's demeanor . . . ." Walters v. Commissioner of Social Sec., 127 F.3d 525, 531 (6th Cir. 1997); see also Casias v. Secretary of Health & Human Servs., 933 F.2d 799, 801 (10th Cir. 1991)("We defer to the ALJ as trier of fact, the individual optimally positioned to observe and assess the witness credibility."). Because the administrative law judge observed and heard Small testify, the administrative law judge is the one best suited to assess her credibility.

It appears that the administrative law judge appropriately took into account all of Small's physical and mental limitations in the residual functional capacity assessment.

A review of the administrative record reveals that the decision of the Commissioner is supported by substantial evidence. Therefore, pursuant to 42 U.S.C. §405(g) the decision of the Commissioner is affirmed.

An appropriate order will follow.


s/ *Malachy E. Mannion*
**MALACHY E. MANNION**
**United States District Judge**

Dated: September 30, 2014
O:\Mannion\shared\MEMORANDA - DJ\CIVIL MEMORANDA\2013 MEMORANDA\13-2347-01.wpd